**UNITED STATES of America f/u/o Premier Electric International Corp., Plaintiff-Appellee,**

v.

**ARDEN ENGINEERING ATLANTIC CONTRACTORS, INC., et al., Defendants-Appellants.**

No. 72–1036.

United States Court of Appeals, First Circuit.

Heard June 6, 1972.

Decided July 7, 1972.

John P. Birmingham, Jr., Boston, Mass., with whom Mintz, Levin, Cohn & Glovsky, Boston, Mass., was on brief, for appellants.

A. Denison Weaver, Chicago, Ill., for appellee.

Before ALDRICH, Chief Judge, McENTEE and COFFIN, Circuit Judges.

PER CURIAM.

Premier Electric International Corp. brought this action under the Miller Act[1] for the unpaid balance on its subcontract with Arden Engineering Atlantic Contractors, Inc. The latter admitted its failure to pay and set up as a "special defense" a back-charge against Premier for the value of welding done by Arden which it claims was Premier's obligation under the subcontract. The parties stipulated that the amount in controversy was $23,904.71. The district court, sitting without a jury, found in favor of Premier. Arden appeals on the ground that the court erred in considering parol evidence in interpreting the subcontract.

In 1965 Arden contemplated bidding on the construction of an FBIS (Foreign Broadcast Information Service) monitoring station at Mayaguez, Puerto Rico. It requested a subcontract price from Premier for the electrical work. Premier submitted an oral bid of $110,000. Subsequent to the award of the prime contract to Arden, the parties entered into an integrated subcontract under which Premier was obligated to do all the electrical work according to the plans and specifications of the prime contract. Section 44–42 of the specifications provides as follows:

"GROUNDING SYSTEM:

(a) Furnish and install complete grounding system and make connections to all electrical equipment as shown on the Drawings and herein specified.

(b) In Operation's Building, all wire mesh in Electronics Shop, conduits, ducts, louvers, trench separators, trench cover frames, machinery, motors, pumps, fans, compressors, air conditioning units, etc., shall be connected to the nearest grounding conductors.

(c) In general, all metal pieces greater than 4 feet 6 inches in length, including the regular electrical or radio current carrying system, shall be grounded once; pieces 9 feet 0 inches or greater in any dimension shall be ground at the ends of the piece and 10 feet 0 inches o. c. maximum in both directions. . . . ."

The dispute here involves the steel bars used to reinforce concrete. Normally these bars are neither welded together nor grounded. In this building, however, it was necessary to weld the reinforcing steel together in order to form an electrically continuous network and then to attach copper wires to the steel so that the reinforcing system could be attached to the central grounding system.[2] The grounding system itself consisted of a continuous network of heavy copper cables which ran throughout the building in covered trenches and extended one hundred feet beyond it in a radial pattern.

Arden contends that the welding of the reinforcing steel is part of the grounding system and is Premier's obligation under § 44–42(c). It relies particularly on a "structural" drawing entitled "Grounding System Details" which indicates how the welding and grounding of the reinforcing steel should be accomplished. Without more we might be inclined to agree that the welding was unambiguously Premier's duty. However, the subcontract contains the fol-

---

1. 40 U.S.C. § 270b (1970).

2. The contention that reinforcing steel is an integral part of the grounding system is without merit. For if it were, Premier would have been obliged to furnish and install it under § 44–42(a). Since the "Concrete" specifications describe in detail the provision and installation of reinforcing metal, this was obviously Arden's obligation.

lowing exclusion inserted at Premier's insistence: "All excavation, concrete work, and placing of emergency generators to be performed by Arden." The exclusion of "concrete work" in this subcontract is capable of various constructions. Since electrical subcontractors do not normally do concrete work, it can hardly be said that its meaning is self-evident. One likely interpretation of this ambiguity is that the exclusion was intended to cover the performance of any electrical work found in the "Concrete" specifications. Such an interpretation is reasonable in view of the reference in those specifications to grounding reinforcing steel "as specified in section entitled Electrical Systems. . . ." Moreover, this appears to be the only item in the "Concrete" specifications which arguably Premier was obliged to perform.

■ The conduct of the parties subsequent to the execution of the subcontract supports the interpretation that "concrete work" excluded the welding of reinforcing bars. After work had commenced the government rejected Arden's "schedule of estimates" [3] because the concrete category was too high and the electrical categories too low. Arden justified its estimates by asserting that the concrete category included welding reinforcing steel. The "too low" estimate for electrical work corresponded exactly with Premier's subcontract price of $110,000. In view of the potential magnitude of the welding job, Arden's failure to make a written demand on Premier to do it is further evidence that Arden understood that this work was not Premier's obligation. Nor did Arden indicate that it intended to back-charge Premier for the welding until 1968, despite the fact that much of the work was done in 1966. Furthermore, when in February 1967 Premier's accountant requested confirmation that Arden owed Premier $5,227.87, Arden

confirmed the amount with some adjustments, including a $192 back-charge for rental of a back-hoe. There was no mention of any back-charge for welding reinforcing steel despite the fact that at least 1600 hours had been spent doing that job during 1966.

 In view of the above evidence of Arden's understanding of the meaning of the concrete work exclusion, the district court did not err in confirming its interpretation by considering parol evidence that Premier had explicitly excluded welding of reinforcing steel at the time it submitted its oral bid. Moreover, such evidence was proper because it did not vary the terms but rather explained their meaning. See Corbin on Contracts § 579 (1960).

Affirmed.

---

3. A "schedule of estimates" is a rough summary showing the monetary value of the various categories of work performed on the project and is used as a basis in preparing progress payments.